**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | No. 18 C 07040 |
| v. | ) | |
| | ) | Chief Judge Virginia M. Kendall |
| MIROSLAW KREJZA | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

In September 2023, a federal jury found Defendant Miroslaw Krejza guilty of conspiracy to commit an offense against the United States (Count One) and aiding and abetting embezzlement by a bank officer (Count Nine). (Dkts. 1188, 1189). Pending before the Court are Krejza's Motion for Leave to Amend his Motion for Judgment of Acquittal or New Trial, (Dkt. 1630), and his Motion for Judgment of Acquittal or New Trial, (Dkt. 1311). For the reasons below, the Court denies Krejza's Motion for Leave to Amend [1630] and Motion for Judgment of Acquittal or New Trial [1311].

**BACKGROUND**

**I.     The Indictment**

On December 7, 2023, a federal grand jury returned its Fourth Superseding Indictment charging Krejza with (1) conspiring, with nine other individuals employed by or otherwise associated with the federally insured Washington Federal Bank for Savings (Washington Federal), to commit an offense against the United States in violation of 18 U.S.C. §§ 371, 1005, 656 (Count One), and (2) aiding and abetting embezzlement by a bank officer in violation of 18 U.S.C. §§ 2, 656 (Count Nine). (Fourth Superseding Indictment, Dkt. 534 at 1–25, 39).

1

With respect to the offense of conspiracy to commit an offense against the United States under 18 U.S.C. § 371, the grand jury specifically charged that Krejza and others[1] conspired to commit two underlying criminal offenses against the United States: (1) to knowingly make false entries in the books and records of Washington Federal to injure and defraud the bank and deceive the Office of the Comptroller (OCC) and the Federal Deposit Insurance Corporation (FDIC) in violation of 18 U.S.C. § 1005; and (2) to embezzle, abstract, purloin, and willfully misapply moneys, funds, and credits of Washington Federal and money, funds, assets, and securities intrusted to the custody and care of Washington Federal in violation of 18 U.S.C. § 656. (Fourth Superseding Indictment, Dkt. 534 at 5). With respect to the aiding and abetting embezzlement offense, the grand jury charged that Krejza "did aid, abet, counsel, command, induce, and procure the embezzlement and willful misapplication by officer, director, agent, or employee of Washington Federal . . . in excess of approximately $2.8 million in moneys, funds, and credits of Washington Federal and moneys, funds, assets, and securities intrusted to the custody and care of Washington Federal, with intent to injure and defraud Washington Federal" in violation of 18 U.S.C § 2, 656. (Fourth Superseding Indictment, Dkt. 534 at 39).

Specifically, the grand jury charged that, as part of the alleged conspiracy, Krejza solicited and received embezzled funds in form of disbursements of Washington Federal loans "knowing that certain purported loans were not properly documented and that, with respect to the loans which had documentation, repayment on the terms of these purported loans was not expected[.]" (Fourth Superseding Indictment, Dkt. 534 at 6–9). The grand jury further charged that such loan disbursements were "in excess and in additional to the principal amounts on notes, on matured

---

[1] The individuals charged in the conspiracy included Krejza, Robert Kowalski, Rosallie Corvite, Jane Iriondo, Alicia Mandujano, Cathy Torres, James Crotty, Boguslaw Kasprowicz, Marek Matczuk, and William Kowalski. (Fourth Superseding Indictment, Dkt. 534 at 5).

notes, and in excess and in additional to the value of the collateral securing the purported loans." (*Id.* at 9). The grand jury also charged that, as part of the alleged conspiracy, other defendants— including Alicia Mandujano, Jane Iriondo, and Cathy Torres—"fraudulently created false notes, loan modification agreements, and other loan documents to make it appear that the purported loans under which money embezzled from Washington Federal was distributed" to Krejza "were properly documented," and that Krejza "did misrepresent, conceal and hide, and cause to be misrepresented, concealed and hidden, acts done in further of the conspiracy[.]" (*Id.* at 15–19).

## II.    The Government's Theory of the Case & The Defense

On September 22, 2023, a federal jury found Krejza guilty of conspiracy to commit an offense against the United States (Count One) and aiding and abetting embezzlement by a bank officer (Count Nine). (Dkts. 1188, 1189). At trial, the government argued that Krejza conspired with John Gembara, the president of Washington Federal (also referred to as Individual A), co-defendant Marek Matczuk, bank employees, and other associates of Gembara (including Robert Kowalski and Boguslaw Kasprowicz) to embezzle bank funds and falsify bank records. (Trial Tr. vol. 2-A, Dkt. 1223 at 42, 46–47). Specifically, the government asserted that Krejza "took more $2 million of embezzled funds" from Washington Federal. (Trial Tr. Vol. 2-A, Dkt. 1223 at 42). According to the government, the vehicle to embezzle the funds was a set of commercial construction loans that Krejza and Gembara never intended to be paid back. (*Id.*) The government argued that Krejza instead did not complete the construction projects, did not sell the properties, never paid off the loans or made regular payments, received disbursements in excess of the agreed amount, and used the loan disbursements for his own personal expenses, not construction expenses. (*Id.* at 42–43). And when Krejza wanted more funds, the government asserted he would simply ask Gembara, "sign a stub[,] and walk away with a check[.]" (*Id.* at 44). And by soliciting

these embezzled funds, the government argued that Krejza also aided and abetted the embezzlement. (*Id.*)

In his defense, Krejza argued that although the construction projects for which Washington Federal issued the loans were never completed, he intended to complete the projects when Washington Federal issued the loans and intended to pay off the loans but failed to do so because he lacked the money. (Trial Tr. Vol. 2-A, Dkt. 1223 at 55). Krejza further argued that his lack of fraudulent intent is evidenced by the fact that he used the loan money to purchase the properties contemplated by the loans, and the fact that two of the projects—the Tripp and Spaulding properties—were "nearly finished," and the other third project—the Lawndale property—was "roughly halfway finished." (Trial Tr. Vol. 2-A, Dkt. 1223 at 56). Krejza also argued that his use of the loans funds for personal expenses merely reflected the fact that he was entitled to payment for the work he did on the properties. (*Id.*)

According to Krejza, he failed to sell the underlying properties due to the housing market collapse during the 2008 recession, a construction defect affecting two of the properties that was the subject of protracted litigation against a subcontractor, and other issues affecting the properties, such as mold and thievery. (*Id.* at 56–57). Krejza asserted that the additional funds he received from Washington Federal were for the purpose of remediating the properties and funding the lawsuit against the subcontractor. (*Id.* at 57). According to Krejza, the fact that Washington Federal never foreclosed on the properties, despite Krejza defaulting on the loans, was not evidence that the loans were fraudulent but rather reflected Washington Federal's general policy of not foreclosing on defaulted loans. (*Id.* at 57–58). Krejza further argued that, unlike the other co-conspirators, he was not friends with Gembara and did not socialize with Gembara. (*Id.* at 58).

4

### III.    The Evidence at Trial

### A.  Washington Federal & The Charged Conspiracy

At trial, the government introduced evidence documenting that the federal government insured Washington Federal from 1989 until its closure in 2017. (Trial Tr. 2-B, Dkt. 1224 at 188–89, 206); Gov. Ex. 700. In additional to serving as president of Washington Federal, Gembara also led the lending team and served as chairman of the bank's board of directors. (Trial Tr. Vol. 3-B, Dkt. 1226 at 421). The government offered testimony from numerous alleged coconspirators and bank employees who described how Gembara and certain bank employees worked in concert to illicitly disburse bank funds through fraudulent loans to Gembara's friends and associates (including Krejza, Matczuk, Robert Kowalski, and Kasprowicz) and falsify bank records to try to make the disbursements appear legitimate.

### a.  Use of Loans to Embezzle Bank Funds

The jury saw documents evidencing that several of Gembara's associates— including Krejza, Matczuk, and Robert Kowalski—received multiple loans that were non-performing and improperly documented. (Trial Tr. vol. 2-A, Dkt. 1223 at 107–08; Trial Tr. 2-B, Dkt. 1224 at 132–39, 164–72); Gov. Ex. 424, 772A–J. The jury heard the testimony of Billy Lyons, one of the national bank examiners who was part of the Office of the Comptroller of the Currency (OCC) examination of Washington Federal in 2017. (Trial Tr. vol. 2-A, Dkt. 1223 at 64). Lyons testified that during the examination, inspectors received a list of "balloon loans"—loans for which a single "balloon payment" was due at maturity—that were not included on the loan trial balance Washington Federal provided to examiners. (Trial Tr. vol. 2-A, Dkt. 1223 at 68–69, 95–103); Gov. Ex. 771, 424. The loan trial balance is the statement documenting the bank's loan obligations,

payments owed and received, and interest accrued pursuant to its loan agreements. (Trial Tr. vol. 2-A, Dkt. 1223 at 73).

Lyons explained that included on this balloon loan list were loans to Krejza and others, which were unpaid, unsupported by any note or supported by notes for amounts of money different than the amount provided to the borrower, and unsecured. (Trial Tr. vol. 2-A, Dkt. 1223 at 107–08; Trial Tr. 2-B, Dkt. 1224 at 132–39); Gov. Ex. 424, 772, 773, 774, 775. Lyons also testified that Washington Federal initiated an unusually low number of foreclosures between 2008 and 2012. (Trial Tr. vol. 2-B, Dkt. 1224 at 142). The jury saw loan payment slips and heard testimony from IRS revenue agent Haydee Gonzalez, explaining that when Washington Federal recorded loan payments by Krejza and Matczuk, these loan payments reflected not receipts of actual checks or cash paid by the borrowers but "journal entries," whereby bank employees would mark accrued interest as paid and add the amount to the principal. (Trial Tr. 2-B, Dkt. 1224 at 263–69; Trial Tr. 3-A, Dkt. 1225 at 277–286); Gov. Ex. 215 (Loan Payment Slips). Alicia Mandujano, who worked as a loan servicer at Washington Federal, described the same practice. (Trial Tr. 4-A, Dkt. 1227 at 611–12).

Furthermore, the jury heard testimony that the disbursements of these Washington Federal loans to Gembara's associates were frequently not used for the stated purposes of the loans. For example, the jury heard William Kowalski testify that he, his brother Robert Kowalski, and Gembara owned and operated a real estate development company that did business with Washington Federal at the same time Gembara was president of the bank. (Trial Tr. 3-A, Dkt. 1225 at 290–94). William Kowalski further testified that the trio bought a boat using $190,000 obtained from Washington Federal, and that he later learned the amount was added to the balance of an unrelated Washington Federal loan associated with a property owned by William Kowalski

without any expectation that it needed to be repaid. (Trial Tr. 3-A, Dkt. 1225 at 295–308, 321–23).

The jury also heard from testimony from Krejza's brother-in-law Boguslaw Kasprowicz—another real estate developer and associate of Gembara, Robert Kowalski, and Matczuk—detailing that after Robert Kowalski introduced him to Gembara, he began receiving real estate development loans from Washington Federal and became friends with Gembara. (Trial Tr. 3-A, Dkt. 1225 at 328–39, 395). Kasprowicz explained, however, that after he ceased construction development and sold five of the six properties securing his loans in 2011, he continued to personally ask Gembara for funds and receive additional loan disbursements from Washington Federal in the form of checks provided by bank employee Alicia Mandujano, without signing any loan modification agreements or other documentation of what he intended to use the money for. (Trial Tr. 3-A, Dkt. 1225 at 339–44, 402–06).

Kasprowicz testified that in total, he asked Gembara for and received around $14 million from Washington Federal over the relevant years. (Trial Tr. 3-A, Dkt. 1225 at 341). Kasprowicz told the jury that he used the money to pay his personal living expenses, car payments, and mortgage payments, and upon Gembara's request, to pay Gembara's personal bills, including credit card payments and boat payments, and to pay Robert Kowalski; ultimately, the funds used for Gembara's benefit amounted to $1.7 million. (Trial Tr. 3-A, Dkt. 1225 at 341–46, 349–61, 396). Kasprowicz further testified that upon Gembara's request, he would frequently operate Gembara's boat, run errands for Gembara, and perform construction and maintenance work on the homes of Gembara, other bank employees, and Gembara's friends without payment. (Trial Tr. 3-A, Dkt. 1225 at 354–63). Kasprowicz also testified that Gembara told him that Robert Kowalski used loan disbursements from Washington Federal to pay personal expenses and take vacations.

(Trial Tr. 3-A, Dkt. 1225 at 358). Kasprowicz further explained that Gembara would threaten him the prospect of forcing him to pay off his loans. (Trial Tr. 3-A, Dkt. 1225 at 385).

### b. Falsification of Bank Records

The jury also heard testimony from several bank employees—including Jane Iriondo, Cathy Torres, Alicia Mandujano, and Rosallie Corvite—explaining how Gembara instructed them to falsify bank records. For example, Iriondo testified that in her experience as a secretary, the list of delinquent loan accounts provided to her by Mandujano, a member of the lending team, never included Matczuk, Krejza, Robert Kowalski, or Kasprowicz. (Trial Tr. 3-B, Dkt. 1226 at 415–25). Iriondo further testified that Gembara instructed her to alter bank records, including property appraisals, loan trial balances, loan delinquencies, and loan histories, typically around the time of audits or examinations of the bank; these alterations included the removal of customers and changes to loan balances and maturity dates. (Trial Tr. 3-B, Dkt. 1226 at 426–27). Iriondo explained that she had also seen Mandujano make similar alterations to bank records, including some alterations that required physically modifying documents using scissors and glue and then photocopying them to generate a new electronic version of the document. (Trial Tr. 3-B, Dkt. 1226 at 432–34).

In support of Iriondo's testimony, the jury saw a document that Iriondo maintained, which listed the loans that Gembara instructed her to exclude from the loan trial balances; the list included loans belonging to Matczuk, Kasprowicz, and Krejza. (Trial Tr. 3-B, Dkt. 1226 at 426–29); Gov. Ex. 785. The jury also saw emails between Iriondo and other bank employees, including loan officer Torres and vice president James Crotty, in which they discussed edits to property appraisals that Gembara expected to be made. (Trial Tr. 3-B, Dkt. 1226 at 422, 426–35); Gov. Ex. 403, 404, 405. Iriondo explained that the alterations to the property appraisals involved increasing property

8

values in order to satisfy the loan-to-value ratio required under Washington Federal's policy governing real estate loans. (Trial Tr. 3-B, Dkt. 1226 at 422, 434–35). The jury also heard FDIC-OIG agent Peter Caggiano testify that the metadata for loan documents, including a promissory note for one of Krejza's loans, were created after the start of the FDIC's examination of Washington Federal in 2017. (Trial Tr. 3-B, Dkt. 1226 at 491–92).

Additionally, Cathy Torres testified that in her role as a loan officer, Gembara instructed her to modify notes, mortgages, and appraisals for "[Gembara]'s friends", including Krejza and Matczuk. (Trial Tr. 4-A, Dkt. 1225 at 552–56, 561–64). Torres explained that when she modified the loans of Gembara's friends, Gembara would tell her that he would have the borrower sign the documents or ask Torres to copy and attach an existing signature page to the new loan modification document. (*Id.* at 552–56, 561–64, 578–79). Torres also explained that when Gembara told them to modify one of his friend's loans, she would bypass the usual loan procedures, such as appraising the collateral, completing supporting documentation, and running the transaction through the underwriting department. (*Id.* at 552–56, 561–64).

### B. Krejza's Participation & Loans from Washington Federal

#### a. Krejza's Loans

The government introduced evidence— including the loan snapshots and the OCC Write-Up—documenting four loans[2] Washington Federal made to Krejza and his company, M&R Development, Inc., to finance residential construction at three properties (4207 N Lawndale, 3135 N Spaulding, and 2020 N Tripp), beginning in 2005. (Trial Tr. 2-B, Dkt. 1224 at 132–39, 164–72; Trial Tr. 3-A, Dkt. 1225 at 283–84); Gov. Ex. 775, 772A, 772B, 772D, 772E. The government's

---

[2] The four loan account numbers were 20888, 21509, 21449, and 21512. (Trial Tr. 2-B, Dkt. 1224 at 164–72); Gov. Ex. 772A, 772B, 772D, 772E.

evidence showed that as recently as 2017, Washington Federal repeatedly extended and modified these loans to fund additional advances to Krejza without proper documentation, such as witness signatures. (Trial Tr. 2-B, Dkt. 1224 at 132–39). The government's evidence also showed that, as of 2017, Washington Federal listed each of the loans as only 27 or 33 days past due, despite Krejza failing to make any payments in the several years prior. (*Id.*) As of 2017, the loans had outstanding balances of approximately $1.5 million, $3.2 million, $1.5 million, and $1.3 million. (*Id.*) Additionally, two of the loans were purportedly secured by the same property but only one security interest was recorded. (*Id.* at 138). The purpose for one of the loans was also not documented, and the same loan did not have a promissory note supporting it. (*Id.* at 138, 143). Washington Federal's total exposure to Krejza was approximately $5.9 million, while the value of the collateral was $1.9 million. (*Id.* at 138).

Gabriel Fakhouri, a manager of Recording Operations for the Cook County Clerk's Office, described how the last records of Washington Federal's security interests in the N Spaulding and N Tripp properties were modified mortgage loan agreements filed in 2009, (Trial Tr. 5-A, Dkt. 1229 at 790–804), even though these loans were modified as recently as 2017. FDIC-OIG agent Jason Gibson's testimony described how his analysis of Krejza's bank accounts revealed that between 2013 and 2017, Krejza received $480,000 from Washington Federal. (Trial Tr. Vol. 7-A, Dkt. 1234 at 1292–1303,). Gibson testified that his analysis showed how in 2016 and 2017, Krejza used loan disbursements—totaling $15,000—to pay for two trips to Poland. (*Id.* at 1304–11). Gibson further testified that his analysis revealed that between 2013 and 2015, Krejza used loan disbursements to make monthly retail installment payments on his BMW. (*Id.* at 1311–14). Gibson also explained that his analysis of Krejza's bank accounts demonstrated that in 2018, Krejza made false statements describing the extent of his travel in the Affidavit of Financial Condition he

submitted to the FDIC. (*Id.* at 1317–20). In the same Affidavit, Krejza stated that he estimated the value of each of the three properties that were the subjects of his loans at $200,000. (*Id.* at 1319–20). Gibson also described how Krejza maintained records of his loans—including check stubs recording loan disbursements, loan billing notices detailing interest payments he did not actually make, and copies of Form 1098 recording interest payments he did not actually make—that he produced to the government in response to a subpoena. (*Id.* at 1323–43).

Cathy Torres testified that in her role as a loan officer, she and Mandujano would cut checks, drawing from Washington Federal's funds, for Krejza and Matczuk. (Trial Tr. 4-A, Dkt. 1227 at 550–51). Torres described one instance where Gembara told her that Krejza needed a bank check to pay for travel abroad to Krejza's mother's funeral. (*Id.* at 551). And although Krejza was not making loan payments and Krejza's loans did not have associated escrow accounts into which a customer can deposit funds for the bank to use for tax payments, (Trial Tr. 2-B, Dkt. 1224 at 132–39; Trial Tr. 4-A, Dkt. 1227 at 597–603), Torres described how Gembara instructed her to make tax payments for Krejza's properties and charge the payments to Krejza's loans. (Trial Tr. 4-A, Dkt. 1227 at 618–24; Trial Tr. 4-B, Dkt. 1228 at 629–34). Mandujano similarly testified that from 2007 to 2017, she regularly cut checks for Krejza under Gembara's direction and in Krejza's presence, without regard to the promissory notes for Krejza's loans and the fact that Krejza failed to make loan payments. (Trial Tr. 4-B, Dkt. 1228 at 646–48, 657–59). Mandujano also testified that Krejza never inquired about whether his loans had existing capacity for additional disbursements. (Trial Tr. 4-B, Dkt. 1228 at 673). Marsha Bradly, however, testified that in her experience as a loan officer assigned to Krezja, that the loans at issue were "real loans" and that Gembara did not want to foreclose on them because he hoped that Krejza would be able to pay

them off since the properties were all almost completed. (Trial Tr. Vol. 9-A, Dkt. 1238 at 1671–1700).

### b. Krejza's Properties

Timothy Juska, the residential real estate appraiser who appraised the N Spaulding property in 2007, described how he assessed the property as approximately 65% complete at the time of his inspection. (Trial Tr. 4-B, Dkt. 1228 at 749–59). Michael Gillespie, a neighbor who lived across from the N Spaulding property, testified that construction at the North Spaulding property halted in 2008, leaving the building unfished until construction resumed in 2020. (Trial Tr. 5-A, Dkt. 1229 at 776–79). Gillespie further testified that in 2008, he stopped seeing signs advertising that the N Spaulding property was on the market. (*Id.* at 780). Julissa Quinones, a licensed realtor who Krejza hired to list the N Tripp Property for a short period of time in 2007, testified that that the N Tipp property was done in 2007 and Krejza set the price at $699,000, which she believed to be too high for the neighborhood (*Id.* at 781–89). [1620-22, 1683-85, 1716-18, 1740-51]

### c. Krejza's Relationship with Gembara

Kasprowicz introduced Krejza to Gembara when Krejza expressed interest in constructing a house on his own. (Trial Tr. 3-A, Dkt. 1225 at 365). And although Kasprowicz testified that Krejza was not present at the social gatherings that Gembara hosted and Kasprowicz attended, (Trial Tr. 3-A, Dkt. 1225 at 396), Torres testified that in her role as a loan officer at Washington Federal, Krejza was part of the group of individuals that she and other bank employees referred to as Gembara's friends because "[t]hey were able to just come up to the second floor whenever they wanted to" and "didn't provide the documentation that they needed to provide like other [loan] customers would." (Trial Tr. 4-A, Dkt. 1227 at 546–48). Mandujano testified that she and other bank employees referred to Krejza, Robert Kowalski, Kasprowicz, and Matczuk as "friends of

12

John [Gembara][.]" (Trial Tr. 4-A, Dkt. 1227 at 614–15). Mandujano further testified that Krejza was not able to meet with Gembara whenever Krejza wanted to, but Krejza was nonetheless able to schedule meetings with Gembara, including by leveraging Gembara's interest in overseeing the completion and submission of loan verification forms to the bank's auditors. (Trial Tr. 4-A, Dkt. 1227 at 666–67, 703–07). Iriondo similarly testified that she would see Krejza meeting with Gembara at the bank. (Trial Tr. 3-A, Dkt. 1225 at 462).

## LEGAL STANDARDS

### I.      Motion for Judgment of Acquittal

Under Rule 29, a judgment of acquittal "must be granted when the 'evidence is insufficient to sustain a conviction.' " *United States v. Filer*, 56 F.4th 421, 425 (7th Cir. 2022) (quoting *United States v. Jones*, 713 F.3d 336, 339–40 (7th Cir. 2013)). Evidence is sufficient to sustain a conviction when, "viewing the evidence in the light most favorable to the prosecution, '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Id.* (quoting *Jones*, 713 F.3d at 340) (emphasis original). The Court "may not 'reweigh evidence or reassess witness credibility and may uphold a conviction based on circumstantial evidence.' " *United States v. Foy*, 50 F.4th 616, 624 (7th Cir. 2022) (quoting *United States v. Medina*, 969 F.3d 819, 821 (7th Cir. 2020)). While the defendant bears "a high, 'nearly insurmountable hurdle[,]' " ultimately "the height of the hurdle depends directly on the strength of the government's evidence." *Id.* (first quoting *United States v. Armbruster*, 48 F.4th 527, 531 (7th Cir. 2022); and then quoting *United States v. Moreno*, 922 F.3d 787, 793 (7th Cir. 2019)).

### II.      Motion for New Trial

Under Rule 33, the Court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). When deciding if a new trial is warranted based on the

weight of the evidence at trial, the Court asks "whether the verdict is so contrary to the weight of evidence that a new trial is required in the interests of justice." *United States v. Chambers*, 642 F.3d 588, 592 (7th Cir. 2011) (quoting *United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999)); *United States v. Morales*, 910 F.2d 467, 468 (7th Cir. 1990) (" 'If the complete record . . . leaves a strong doubt as to the defendant's guilt, even though not so strong a doubt as to require a judgment of acquittal, the district judge may be obliged to grant a new trial.' "). In doing so, the Court need not view all evidence in the light most favorable to the prosecution, and "may reweigh the evidence, taking into account the credibility of the witnesses." *United States v. Washington*, 184 F.3d 653, 657–58 (7th Cir. 1999). Although the Court's discretion to grant a new trial is "quite broad," the Court cannot "set aside the verdict simply because it feels some other result would be more reasonable[.]" *United States v. Reed*, 875 F.2d 107, 113 (7th Cir. 1989) (quoting *United States v. Martinez*, 763 F.2d 1297, 1312–13 (11th Cir.1985)); *United States v. Gillaum*, 372 F.3d 848, 857 (7th Cir. 2004).

## DISCUSSION

### I.    Motion for Leave to Amend Motion for Acquittal

Krejza moves for leave to amend his Motion for Judgment of Acquittal by attaching an addendum "address[ing] misstatements made in the government's sentencing memorandum and forfeiture motion." (Dkt. 1630 at 1). The Court concludes that Krejza is not entitled to amend his Motion for Judgment of Acquittal for the following reasons. First, to the extent Krejza seeks to correct errors in the government's sentencing memorandum and forfeiture motion, Krejza can respond to those filings; amending the Motion for Judgment of Acquittal is not the correct procedure for correcting such purported errors. Second, as the government points out, Krejza's request is untimely. The filing deadlines for post-trial motions under Rules 29 and 33 are "claim-processing rules" that are "inflexible[.]" *Eberhart v. United States*, 546 U.S. 12, 19 (2005); (Dkt.

14

1631 at 1). Accordingly, the Court denies Krejza's Motion for Leave to Amend his Motion for Judgment of Acquittal. (Dkt. 1630).

## II. Motion for Judgment of Acquittal

In support of his Motion for Judgment of Acquittal, Krejza first argues that because Gembara did not receive a kickback from Krejza, Gembara did not, as a matter of law, commit the underlying offense of embezzlement with respect to Krejza's loans, such that Krejza could not have conspired to embezzle funds or aided and abetted the embezzlement of bank funds. (Dkt. 1311 at 2–11). Second, Krejza raises claims that the government's alternative theory of liability for the aiding and abetting embezzle violated his right to a unanimous verdict and created an improper variance. (Dkt. 1311 at 12–14). Third, Krejza argues that the government's evidence is insufficient to support the conspiracy conviction because the evidence, including Marsha Bradley's testimony, shows that the loans were not fraudulent but simply bad loans and that Krejza lacked knowledge of an agreement to falsify records. (Dkt. 1311 at 1, 11–20).

### A. Conspiracy (Count One)

Under the federal conspiracy statute, 18 U.S.C. § 371, criminal liability arises where "two or more persons conspire . . . to commit any offense against the United States . . . or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy[.]" 18 U.S.C. § 371. To sustain a conviction for conspiracy to commit an offense against the United States under 18 U.S.C. § 371, the government had to prove the existence of three elements beyond a reasonable doubt: "(1) an agreement to commit an offense against the United States; (2) an overt act in furtherance of the conspiracy; and (3) knowledge of the conspiratorial purpose" and the specific intent that the underlying crime be committed by a conspirator. *United States v. Foy*, 50 F.4th 616, 624 (7th Cir. 2022) (quoting *United States v. Jones*, 993 F.3d 519, 531 (7th Cir. 2021)); *Ocasio v. United States*, 578 U.S. 282, 287–88, 292 (2016);

*United States v. Soy*, 454 F.3d 766, 768 (7th Cir. 2006); *United States v. Kruse*, 606 F.3d 404, 408 (7th Cir. 2010); *United States v. Kowalski*, 2021 WL 4318074, at *2 (N.D. Ill. Sept. 23, 2021) (Kendall, C.J.). And "in order to sustain a judgment of conviction on a charge of conspiracy to violate a federal statute, the Government must prove at least the degree of criminal intent necessary for the substantive offense itself." *Soy*, 454 F.3d at 768 (quoting *United States v. Feola*, 420 U.S. 671, 686 (1975)); *Ocasio*, 578 U.S. at 287–88, 292 ("In other words, each conspirator must have specifically intended that some *conspirator* commit each element of the substantive offense.") (emphasis original); *United States v. Kelerchian*, 937 F.3d 895, 914–15 (7th Cir. 2019).

An agreement to commit an offense against the United States may be explicit or tacit. *Foy*, 50 F.4th at 624. And "[c]ircumstantial evidence may be enough to prove an agreement—for example, evidence 'aimed at showing that the co-conspirators embraced the criminal objective of the conspiracy, the conspiracy continued onward towards its common goal,' and the relationship among the co-conspirators was a cooperative one." *Id.* (quoting *United States v. Handlin*, 366 F.3d 584, 589 (7th Cir. 2004)). " '[F]or a single, overarching conspiracy to exist,' the participants 'must have been aware of each other and must do something in furtherance of some single, illegal enterprise.' " *United States v. Griffin*, 76 F.4th 724, 742 (7th Cir. 2023) (quoting *United States v. Avila*, 557 F.3d 809, 814 (7th Cir. 2009)). Where "an indictment alleges a conspiracy with multifarious objectives, a conviction will be sustained so long as the evidence is sufficient to show that the defendants agreed to accomplish at least one of the alleged objectives." *United States v. Bucey*, 876 F.2d 1297, 1312 (7th Cir. 1989). And to prove a conspiracy to commit an offense against a federally insured bank, "it is enough if the bank is [federally] insured although the defendant[] does not know it[.]" *United States v. Shively*, 715 F.2d 260, 266–67 (7th Cir. 1983) (citing *United States v. Feola*, 420 U.S. 671, 676 n. 9 (1975)). Furthermore, "the overt act

16

necessary for the conspiracy conviction need not be the underlying substantive crime or an element of that crime[;]" the overt act need only be in furtherance of an object offense. *Soy*, 454 F.3d at 768.

The first object offense of the conspiracy—creation of false bank entries under 18 U.S.C. § 1005—arises where: (1) a conspirator made a false entry in the books or records of a federally insured bank; (2) "[t]he conspirator knew the entry was false when it was made;" (3) [t]he conspirator intended that the false entry injure or defraud the bank, or . . . deceive the Federal Deposit Insurance Corporation or the Office of the Comptroller of the Currency who was appointed to examine the affairs of the bank." (Dkt. 1190 at 19–20 (Jury Instructions)); *United States v. McAnally*, 666 F.2d 1116, 1118–20 (7th Cir. 1981). "An entry is false if it 'represents[s] what is not true or does not exist.' " *United States v. Yates*, 16 F.4th 256, 272 (9th Cir. 2021) (quoting *United States v. Darby*, 289 U.S. 224, 226 (1933)).

The second object offense of the conspiracy—embezzlement of bank funds under 18 U.S.C. § 656—arises where: "(1) [a conspirator] was an employee of a bank; (2) the bank was a federally insured bank; (3) the [conspirator] used her position to embezzle the bank's funds; and (4) the [conspirator] did so with the intent to injure or defraud the bank." *United States v. Parker*, 716 F.3d 999, 1008 (7th Cir. 2013). Embezzlement is the fraudulent conversion or "appropriation of property by a person already in lawful possession of that property." *United States v. Baker*, 722 F.2d 343, 347 n.3 (7th Cir. 1983); *United States v. Bailey*, 734 F.2d 296, 303 (7th Cir. 1984); (Dkt. 1190 at 29 (Jury Instructions)).

The Seventh Circuit has also emphasized that "it is important to distinguish between intent to injure and intent to defraud; either will do, and they are not the same." *United States v. Angelos*, 763 F.2d 859, 861 (7th Cir. 1985). "Intent to defraud" refers to an intent to "take financial

advantage of a confidential relationship" through deceit or dishonesty. *Id.*; *United States v. Jackson*, 33 F.3d 866, 872 (7th Cir. 1994); (Dkt. 1190 at 32 (Jury Instructions)). Under both § 656 and § 1005, "[a] reckless disregard . . . of [the] bank's interest is sufficient to establish the requisite intent to defraud." *United States v. Larson*, 581 F.2d 664, 667 (7th Cir. 1978) (discussing § 656); *United States v. McAnally*, 666 F.2d 1116, 1118–20 (7th Cir. 1981) (discussing § 1005) ("If McAnally, while not desiring to hurt his bank or take money from it, did things that he knew would hurt the bank and he was simply indifferent to that consequence, he could properly be convicted under section 1005."). And "[t]he intent to defraud [or injure] required to support liability . . . is minimal; it 'exists whenever the defendant acts knowingly and the result of his conduct would be to injure or defraud the bank, *regardless of his motive*[.]' " *United States v. Hansen*, 701 F.2d 1215, 1218 (7th Cir. 1983) (emphasis original); *United States v. Crabtree*, 979 F.2d 1261, 1268 (7th Cir. 1992); *United States v. Holland*, 831 F.2d 717, 720 (7th Cir. 1987) ("[I]ntention to repay a loan is irrelevant. To be guilty under § 656, the defendants need only have the intent to defraud, the intent to injure the bank (by defaulting) is not required.").

### a. Object Offense of Embezzlement

First, the Court begins with Krejza's argument that he did not conspire to embezzle bank funds because Gembara never received any of Krejza's loan funds and therefore did not, as a matter of law, commit the object offense of embezzlement. (Dkt. 1311 at 2–11). The Court addresses the substance of this argument in greater detail below with respect to the aiding and abetting embezzlement conviction, but with respect to the conspiracy conviction, this argument is a nonstarter. As noted above, "the overt act necessary for the conspiracy conviction need not be the underlying substantive crime or an element of that crime[.]" *Soy*, 454 F.3d at 768. This means that even assuming Krejza were correct that Gembara did not commit the object offense of

18

embezzlement, that does not negate the overt act element of the conspiracy charge, which Krejza does not otherwise contest.

### b. Sufficiency of the Conspiracy Evidence

Second, Krejza argues that the government's evidence is insufficient to support the conspiracy conviction because the government's evidence does not show that Krejza had knowledge of the agreement to falsify bank records. (Dkt. 1311 at 14–20). The government's evidence, however, was sufficient to show that Krejza knowingly joined the overarching conspiracy to falsify records and embezzle bank funds. With respect to the object offense of embezzlement of bank funds, the government's evidence is sufficient to permit a reasonable juror to conclude that Krejza knew that his solicitation and receipt of funds for purposes other than the stated purposes of his loans and in excess of the agreed amounts was dishonest and improper under the loan agreements. Specifically, the government's evidence—showing that Krejza failed to make payments, used bank funds for purposes outside the loan agreements, and possessed loan documents (including the Form 1098s falsely recording loan payments, loan billing notices, check stubs, and loan settlement agreements)—permit a reasonable juror to conclude Krejza knew that his repeated solicitation of excessive disbursements for purposes outside the loan agreements was dishonest. (Trial Tr. Vol. 7-A, Dkt. 1234 at 1292–1320, 1323–43).

With respect to the object offense of falsifying records, the government's evidence of Krejza's awareness of the fraudulent nature of the loans also permits a reasonable juror to conclude that he knowingly participated in the agreement to falsify bank records when he signed checks, loan verification forms, and the Affidavit of Financial Condition he submitted to the FDIC. Specifically, the government's evidence—showing that Krejza signed checks, completed loan verification forms, and signed the Affidavit of Financial Condition with the awareness that the

checks (as purported records of valid loan disbursements), the loan verification forms (as purported records of valid loan balances), and the Affidavit (as a purported record of his use of loan funds) contained false statements—permits a reasonable juror to conclude that Krejza knowingly participated in the agreement to falsify bank records. (Trial Tr. Vol. 4-B, Dkt. 1228 at 647, 703–07). And even if the government's evidence were insufficient to show that Krejza knowingly joined the conspiracy with respect to the object offense of falsifying bank records, the government's evidence showing that Krejza knowingly joined the conspiracy with respect to the object offense of embezzling bank funds, which is enough to support the conviction. *Bucey*, 876 F.2d at 1312. The government introduced evidence that Krejza personally solicited and received funds in significant excess of the agreed loan amounts and did so with the awareness that the disbursements were improper under the bank's loan procedures. A reasonable juror could thus conclude that Krejza entered the agreement to embezzle bank funds and/or falsify bank records with an intent to defraud Washington Federal because he acted with an awareness that he was taking financial advantage of his confidential relationship with the bank through deceit. *Jackson*, 33 F.3d at 872. The government's evidence was therefore sufficient to support the conspiracy conviction. For the same reasons, the conviction was also not contrary to the weight of the evidence.

### B. Aiding & Abetting Embezzlement by a Bank Officer (Count Nine)

Under 18 U.S.C. § 2, "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principle." 18 U.S.C. § 2. To sustain a conviction under 18 U.S.C. § 2, the government must prove that a defendant (1) knowingly took "an affirmative act in furtherance of [the] offense[,]" (2) "with the intent of facilitating commission of the offense[,]" and (3) the underlying offense was actually

committed. *United States v. Freed*, 921 F.3d 716, 721 (7th Cir. 2019) (citing *Rosemond v. United States*, 572 U.S. 65, 70 (2014)); *United States v. Irwin*, 149 F.3d 565, 571 (7th Cir. 1998); *United States v. Holland*, 831 F.2d 717, 719–20 (7th Cir. 1987).

To prove a defendant took an affirmative act in furtherance of the offense, the government must show more than mere "trivial assistance." *Irwin*, 149 F.3d at 573. To prove a defendant's intent to aid the commission of the underlying offense, "there must be evidence to establish that the defendant shared in the criminal intent of the principal, . . . that is, the state of mind required for the statutory offense must be shown for conviction as an aider and abettor." *United States v. Beck*, 615 F.2d 441, 449 (7th Cir. 1980). Intent to facilitate commission of the offense can be proven by circumstantial evidence, including "evidence that the defendant had a motive to further the crime such as the defendant having a pecuniary stake in the success of the crime, . . . or the defendant having a personal motive such as his relationship to one of the principals[.]" *Irwin*, 149 F.3d at 571–72. Furthermore, "the aid that the defendant gave to the criminal enterprise can be used to support the inference that the defendant by giving the aid intended to further the crime; the law imputes to a defendant the intent to do that which is the natural consequence of his knowing acts." *Id.* Where a defendant is charged with aiding and abetting embezzlement by soliciting and receiving embezzled funds, the government must show that the defendant "knew that [the principal] was giving [them] embezzled funds[.]" *United States v. Johnson*, 447 F.2d 31, 33 (7th Cir. 1971).

### a.  Underlying Offense of Embezzlement

As outlined above, under, the embezzlement of bank funds offense under 18 U.S.C. § 656 includes the following elements: "(1) [a conspirator] was an employee of a bank; (2) the bank was a federally insured bank; (3) the [conspirator] used her position to embezzle the bank's funds; and

(4) the [principal] did so with the intent to injure or defraud the bank." *United States v. Parker*, 716 F.3d 999, 1008 (7th Cir. 2013). And embezzlement is defined as the fraudulent conversion or "appropriation of property by a person already in lawful possession of that property." *Baker*, 722 F.2d at 347 n.3; *Bailey*, 734 F.2d at 303; (Dkt. 1190 at 29 (Jury Instructions)).

Here, Krejza contends that he could not have aided and abetted embezzlement of bank funds because Gembara did not receive any of Krejza's loan funds and therefore did not, as a matter of law, commit the underlying offense of embezzlement. (Dkt. 1311 at 2–11). Neither actual personal pecuniary gain, personal receipt of the converted funds, nor personal pecuniary motive on the part of the charged embezzler are required elements of embezzlement; rather, embezzlement requires only the fraudulent conversion or appropriation of property by a person in lawful possession of the property with an intent to defraud or injure. *See Baker*, 722 F.2d at 347; *see Bailey*, 734 F.2d at 303; *see United States v. Johnson*, 447 F.2d 31, 33 (7th Cir. 1971) (explaining that bank employee committed embezzlement by transferring funds from customer accounts to his friend's account); *see Larson*, 581 F.2d at 667 ("A reckless disregard by a bank official of his bank's interest is sufficient to establish the requisite intent to defraud[,] . . . 'even if as is surely the norm the actor is motivated purely by his own self-interest *or that of another* and wishes no harm to anyone.' ") (emphasis added); *see Morissette v. United States*, 342 U.S. 246, 272 (1952) (explaining that conversion includes misuse and abuse of property).

### b. Unanimity Claim

Krejza next argues that the government's alternative theory of liability for the charge of aiding and abetting embezzlement violated his Sixth Amendment right to a unanimous jury

verdict.[3] (Dkt. 1311 at 12–12); *Ramos v. Louisiana*, 590 U.S. 83, 93 (2020). According to its alternative theory of liability, the government argued that the jury could find that not "every single check was embezzlement" and that Krejza intended to repay the loans in the beginning, but nonetheless convict Krejza because "somewhere along the way, that plan went out the window" and "everything after that is embezzlement." (Trial Tr. 9-B, Dkt. 1239 at 1781–82). More specifically, the government argued:

> You don't have to find every check on Rick Lexby's spreadsheet was embezzled. You don't have to find every deposit in the analysis that Special Agent Gibson did was embezzled. All you have to do is find that at least $1,000 was embezzled. . . . There's so many checks, you just need to pick one. If one of those checks was embezzlement, he is guilty.

(Trial Tr. 9-B, Dkt. 1239 at 1777–78). Krejza contends that the alternative theory casts doubt over whether the jurors unanimously decided when the embezzlement began and when Krejza's intent changed. (Dkt. 1311 at 12–13).

Krejza's argument fails for several reasons. First, Krejza failed to object to the government's closing arguments (or the Court's instructions) on unanimity grounds. Krejza's unanimity claim is thus forfeited, so Krejza may prevail on this claim only if he shows plain error, which he fails to even allege. *United States v. Griggs*, 569 F.3d 341, 343 (7th Cir. 2009); *United States v. Turner*, 651 F.3d 743, 747 (7th Cir. 2011). Second, the government's closing argument comported with the rule that the jury must be unanimous as to the elements of a crime, rather than "the means by which the crime is committed." *Id.* (citing *Richardson v. United States*, 526 U.S. 813, 817–18 (1999)); *Schad v. Arizona*, 501 U.S. 624, 631 (1991) ("A way of framing the issue is suggested by analogy. Our cases reflect a long-established rule of the criminal law that an

---

[3] Krejza does not argue that his right to a unanimous verdict was violated with respect to the conspiracy charge. With respect to the conspiracy charge, the Court instructed the jury that "[y]ou must agree unanimously on at least one offense a defendant agreed to commit." (Dkt. 1190 at 19).

indictment need not specify which overt act, among several named, was the means by which a crime was committed.").

Here, the unanimity rule required that with respect to the charge of aiding and abetting embezzlement, the jury needed to unanimously find the following elements: (1) Krejza knowingly took "an affirmative act in furtherance of [the underlying offense of embezzlement][,]" (2) "with the intent of facilitating commission of the offense[,]" and (3) the underlying offense of embezzlement was actually committed, including that "the [principal] used her position to embezzle the bank's funds." *Freed*, 921 F.3d at 721. Because the fact that the principal used her position to embezzle the bank's funds is an element of the offense, rather than merely the means by which a crime was committed, the jury needed to unanimously agree that a particular transfer of bank funds constituted embezzlement

### c. Variance Claim

In a single sentence, Krejza argues that "[t]he government's alternate rationale for conviction, differing as it did with the charge in the Indictment, is also at odds with the Fifth Amendment requirement to be charged by a grandy jury and . . . Sixth Amendment right to be informed of the nature and cause of the accusation." (Dkt. 1311 at 14). First, the Court agrees with the government that this claim is waived because it is entirely undeveloped. *United States v. Cisneros*, 846 F.3d 972, 978 (7th Cir. 2017). Second, charitably assuming that Krejza means to allege a variance based on the difference between the indictment's theory of liability that the loans were fraudulent from their inception and the government's alternate theory of liability at trial that the loans need not have been fraudulent from their inception, this claim fails because a variance exists when the *facts* alleged in the indictment and the government's proof at trial are materially different. *United States v. Ratliff-White*, 493 F.3d 812, 820 (7th Cir. 2007). And even if Krejza

24

alleged a variance between the material facts alleged in the indictment and those alleged in the government's proof at trial, he further fails to argue that any variance is "fatal" by showing that the purported variance prejudiced his defense. *Id.*

## III.    Motion for New Trial

Krejza argues that a new trial is warranted because the Court erred by (1) excluding evidence of Krejza's prior loans with Washington Federal, (Dkt. 1311 at 20–35), (2) admitting Government Exhibit 775, (*Id.* at 35–40), (3) admitting Government Exhibits 701, 702, and 780, (*Id.* at 40–42), and (4) permitting the government to improperly bolster its case with irrelevant testimony and exhibits. (*Id.* at 42–44).[4] The Court addresses each argument in turn.

### A.  Evidence of Krejza's Prior Loans

First, Krezja argues that the Court erred in excluding evidence of the four prior loans he received from Washington Federal between 1999 and 2004 and paid off, because this evidence was relevant to the issue of whether he acted with fraudulent intent. (Dkt. 1311 at 21–35). The Court excluded this evidence because "evidence that he 'acted lawfully on other occasions is generally inadmissible to prove he acted lawfully on the occasion alleged in the indictment.' " (Dkt. 1153 at 2 (quoting *United States v. Reese*, 666 F.3d 1007, 1020 (7th Cir. 2012) (citations omitted)). To the extent Krejza sought to introduce the evidence that he repaid other loans to show how he acted on particular occasions with respect to the loans at issue in the government's case, the Court determined that the evidence that Krejza paid off other loans was evidence of other acts prohibited by Fed. R. Ev. 404(b)(1). (*Id.*) And in considering Krejza's argument that the evidence

---

[4] Krejza also argues that the Court erred in denying his requested jury instructions, overruling his objections to the government's requested instructions, and denying his pretrial motions, "including those he joined or adopted[.]" (Dkt. 1311 at 44). Because Krejza supports these arguments by merely incorporating his prior objections and motions, (*Id.*), the Court rests on its prior decisions on these matters.

was nonetheless admissible to negate criminal intent under Fed. R. Ev. 404(b)(2), the Court previously found and finds again that Krejza makes a weak showing of the similarities between the between the repaid loans and the loans at issue in the government's case, which, as explained above, were not repaid and had balances that vastly exceeded purposes of the loans and their collateral. *United States v. Burke*, 781 F.2d 1234, 1243 (7th Cir. 1985) ("[T]he question in each case is whether the prior conduct makes more or less likely the existence of some fact that matters."); *United States v. Hill*, 40 F.3d 164, 168–69 (7th Cir. 1990). Additionally, Krejza paid off the prior loans within two to three years of receiving them, (Dkt. 1153 at 1), while the loans at issue in the government's case were not only unpaid for a significantly longer period and improperly extended to permit excessive disbursement but again were never repaid. Furthermore, to the extent Krejza sought to use this evidence to show that he would eventually repay these loans, the relevance was questionable and the probative value was low considering these key differences between the prior loans and the loans at issue in the government's case, such that under Fed. R. Ev. 403, the risks of prejudice and confusion resulting from the impermissible propensity inference outweighed any probative value the evidence may have had. (Dkt. 1153 at 3); *Holland*, 831 F.2d at 720 ("[I]ntention to repay a loan is irrelevant. To be guilty under § 656, the defendants need only have the intent to defraud, the intent to injure the bank (by defaulting) is not required."); *see also United States v. Warner*, 498 F.3d 666, 693 (7th Cir. 2007).

## CONCLUSION

For the reasons above, the Court denies Krejza's Motion to Amend [1630] and Motion for Acquittal or New Trial [1311].

Virginia M. Kendall
United States District Judge

Date: April 29, 2025